**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**July 6, 2012**

# In the Court of Appeals of Georgia

A12A0586. PARGAR, LLC v. CP SUMMIT RETAIL, LLC.

BARNES, Presiding Judge.

This appeal arises from a declaratory judgment action brought by CP Summit Retail, LLC, a commercial landlord, against Pargar, LLC d/b/a Prudential Georgia Realty ("Prudential"), its commercial tenant. CP Summit asked the trial court to declare that Prudential had exercised its option to renew contained in the parties' commercial lease and therefore remained liable under the lease for an additional five-year term. The parties filed competing motions for summary judgment. The trial court granted summary judgment to CP Summit and denied it to Prudential, concluding that the uncontroverted evidence showed that Prudential had exercised its option to renew the lease. Prudential now appeals from the summary judgment order. For the reasons

discussed below, we reverse the trial court's ruling and remand for entry of summary judgment in favor of Prudential.

> We conduct a de novo review of both the law and the evidence on appeal from the grant or denial of a motion for summary judgment. We view the evidence in a light most favorable to the nonmovant in order to determine whether a genuine issue of material fact exists and whether the moving party was entitled to judgment as a matter of law.

(Footnote omitted.) *Piedmont Center 15, LLC v. Aquent, Inc.*, 286 Ga. App. 673 (649 SE2d 733) (2007).

The record reflects that CP Summit owns and operates a retail and office center called Summit Point in Fayetteville, Georgia. On or about February 28, 2005, CP Summit entered into a written commercial lease agreement whereby Prudential agreed to lease office space in the shopping center for five years. Section 1.1 (L) of the lease gave Prudential the option to renew and extend the original lease term for an additional five years and stated that the "[s]aid option shall be exercised, if at all, by written notice [] which must be received by [CP Summit] at least one hundred eighty (180) days prior to the expiration of the then current term." If Prudential exercised the option, Section 1.1 (L) specified that all of the terms and conditions of the original lease would remain in effect during the renewal term, except that the "Fixed

Minimum Rent" for each additional year would be the amount set forth in Section 1.1 (Q) of the lease.

The parties subsequently agreed to three amendments to the original lease. The first amendment, which the parties agreed to on May 31, 2005, modified, among other things, the commencement date for the lease. The second and third amendments – which the parties agreed to on March 26, 2009, and December 31, 2009, respectively – reduced the amount of rent that Prudential owed for certain periods during the original lease term, in addition to other modifications. Under the lease as amended, Prudential was required to give CP Summit written notice of its decision to exercise its renewal option on or before April 30, 2010 – 180 days prior to the expiration of the lease term on October 31, 2010. None of the amendments modified how rent would be calculated under Section 1.1 (Q) for the renewal term if Prudential exercised its option.

On April 30, 2010, the last day available to exercise its option, Prudential sent a letter to CP Summit that read in relevant part:

> This shall serve as official notification of our intent to exercise the option to extend our lease in accordance with the Third (3rd) Amendment to our agreement.

> Please contact [us] at your earliest convenience so that we may discuss a rental rate consistent with today's market, agree to terms, and execute appropriate documents. . . .

CP Summit received the letter that same day.

On May 13, 2010, the senior vice president of Prudential and the executive vice president of CP Summit met to discuss reducing the renewal term to less than five years, lowering the rent for the renewal period, and having certain repairs made to the office space. No agreement on these issues was reached at the meeting.

Later that day, CP Summit's executive vice president sent the following email to Prudential's senior vice president:

> Thank you for coming by today. It was a pleasure meeting you in person. We are glad that you have exercised the option at Summit Point. Prudential is a welcome addition to our project. Based on our conversation, we are prepared to enter into a lease amendment under the following terms[] . . . The May 13th email then detailed a list of proposed terms that differed from those of the original lease, including a different rent amount for the renewal term and the addition of a clause authorizing Prudential to cancel the lease in the third year of the renewal term. The email concluded by stating: "Please let us know if the above meets your approval and we will draft an amendment for your review. Thank you."

Prudential did not respond to the May 13th email over the ensuing months. Instead, Prudential located another office space to rent at a new location, and on July 27, 2010, Prudential informed CP Summit by written letter of its intent to vacate the office space at the shopping center at the end of the current lease term on October 31, 2010.

On August 25, 2010, CP Summit filed this declaratory judgment action against Prudential, seeking a declaration from the trial court that Prudential had exercised its option to renew the lease for an additional five-year term through its April 30, 2010 letter, as well as attorney fees and costs. Both parties filed motions for summary judgment on the issue of whether Prudential had exercised its option and thus would remain liable under the lease for an addition five-year term. In seeking summary judgment, Prudential argued that the second sentence of the April 30th letter clearly demonstrated that its acceptance of the renewal option contained in the lease was conditioned on the parties' agreement to new and different terms for the renewal period. Hence, Prudential argued that the letter was not an operative notice of acceptance of the option, but instead constituted a counteroffer (never accepted by CP Summit) proposing that new rental rates and other terms be reached for renewing and extending the current lease.

In contrast, CP Summit, in seeking summary judgment, focused on the first sentence of the April 30th letter and argued that it reflected that Prudential had unequivocally exercised the renewal option. CP Summit further maintained that the second sentence of the letter did not condition or qualify the exercise of the option reflected in the first sentence, but instead was simply a request to open a dialogue about the possibility of amending some of the terms of the lease that otherwise would apply to the renewal term. Additionally, CP Summit contended that Prudential was estopped from arguing that it had not exercised the renewal option as a result of its failure to respond to the May 15, 2010 email from CP Summit to Prudential. Finally, CP Summit argued that the renewal option should be enforced based upon the doctrine of promissory estoppel.

The trial court agreed with CP Summit's interpretation of the letter and concluded that it was an operative notice of acceptance of the renewal option such that Prudential was liable under the lease to rent the office space for an additional five-year term. Consequently, the trial court granted summary judgment to CP Summit and denied it to Prudential.

On appeal, it is undisputed by the parties that for Prudential to exercise its renewal option under the terms of the original lease, it had to give timely written

notice of its acceptance of the option terms contained in that lease, including the rent schedule set forth in Section 1.1 (Q). It is further undisputed that the only notification by Prudential purportedly accepting or exercising the option was the April 30th letter. Hence, the issue on appeal is whether the trial court properly concluded that the April 30th letter constituted an operative notice of acceptance of the lease renewal option, binding Prudential to an additional five-year term. We conclude that the trial court's conclusion was erroneous.

Under an option contract, "the offeror accepts consideration in exchange for his promise to keep the offer open" for a stated time. *Hewatt v. Leppert*, 259 Ga. 112, 113 (376 SE2d 883) (1989). See *Amwest Surety Ins. Co. v. Ra-Lin Assoc.*, 216 Ga. App. 526, 530 (1) (455 SE2d 106) (1995). While an option contract binds the offeror, the holder of the option retains the discretion whether to accept the offer. *Jakel v. Fountainhead Dev. Corp.*, 243 Ga. App. 844, 846 (534 SE2d 199) (2000).

An option contract, "by its nature unilateral and executory because of the complete discretion granted to the holder of the option," is converted into a bilateral, mutually binding contract only when the holder of the option gives notice of his election to exercise the option on the same terms stated in the option contract. *Kent v. Graham Commercial Realty*, 279 Ga. App. 537, 543 (2) (631 SE2d 753) (2006).

7

See *Martin v. Schindley*, 264 Ga. 142, 143 (442 SE2d 239) (1994); *Redmond v. Sinclair Refining Co.*, 204 Ga. 699, 707 (7) (51 SE2d 409) (1949). To create a mutually binding contract, the option must be accepted unconditionally and strictly in accordance with its terms. See *Atkinson v. Cook*, 271 Ga. 57, 58 (518 SE2d 413) (1999); *Piedmont Center 15, LLC,* 286 Ga. App. at 676; *A&D Asphalt Co. v. Carroll & Carroll of Macon*, 247 Ga. App. 77, 83 (2) (b) (543 SE2d 397) (2000). "Otherwise, there has been no exercise of the option, and no valid contract has been formed." *Atkinson*, 271 Ga. at 58.

Applying these principles to the case-at-hand, we conclude, as a matter of law, that the April 30th letter sent by Prudential was not an unconditional exercise of the option set forth in the original lease but instead was a counteroffer seeking agreement to a new renewal lease with different terms. The first sentence of the April 30th letter did not state that Prudential was exercising the option, but rather that it was Prudential's "intent" to exercise it, indicating, when read in conjunction with the second sentence, that a final decision over whether to renew the lease had not yet been made. In that regard, the second sentence of the letter requested that CP Summit contact Prudential so that the parties could discuss and "*agree to terms*." Thus, read in its entirety, the April 30th letter on its face qualified and conditioned any renewal

8

of the lease by Prudential on the parties discussing and coming to agreement on new and different rental terms, and, therefore, constituted a counteroffer rather than an operative notice of acceptance of the renewal option.[1] See *Butler v. Household Mtg. Svcs.*, 266 Ga. App. 104, 106 (1) (596 SE2d 664) (2004) (letter stating that party "accepted the offer of settlement," but further stating that two additional terms needed to be included in the final settlement, was not a valid and binding acceptance of the settlement offer). See also *A&D Asphalt Co.*, 247 Ga. App. at 83 (2) (b) ("A notice of acceptance that is in any respect conditional or that reserves the party giving it a power of withdrawal is not an operative notice of acceptance.") (footnote omitted); *Lamb v. Decatur Fed. S & L Assn.*, 201 Ga. App. 583, 585 (1) (411 SE2d 527) (1991) ("[A]cceptance of an offer must be unconditional, unequivocal, and without variance of any sort; otherwise, there can be no meeting of the minds and mutual assent necessary to contract formation. Accordingly, a subsequent communication by one

---

[1] While the second sentence of the April 30th letter did not expressly use words such as "on condition that," "if," or "provided that," Georgia law does not require specific technical terms to create a contractual condition. See, e. g., *Rustin v. Butler*, 195 Ga. 389, 391 (24 SE2d 318) (1943); *Munford v. Citizens & Southern Nat. Bank*, 151 Ga. App. 112, 113-114 (258 SE2d 766) (1979). It is sufficient that the letter, when read as a whole, qualified any exercise of the option on an agreement to different rental terms. See *Butler v. Household Mtg. Svcs.*, 266 Ga. App. 104, 106 (1) (596 SE2d 664) (2004)

9

party to the alleged contract that varies even one term of the original offer is a counteroffer.") (citation omitted). Compare *Pritchett v. Afzal*, 293 Ga. App. 302, 303 (1) (666 SE2d 641) (2008) (evidence supported finding that option to renew lease had been exercised by tenant, where attorney for tenant sent letter to landlord stating, without qualification or limitation, that the tenant "is exercising his option to renew the existing lease as per your Lease Agreement").

CP Summit, however, argues that deposition testimony from Prudential's senior vice president and assistant controller regarding the drafting of the April 30th letter, as well as internal emails within Prudential regarding that issue, indicate that Prudential intended for the April 30th letter to constitute an unconditional acceptance of the renewal option. We disagree with CP Summit's characterization of the deposition testimony and emails. Prudential's senior vice president, who had the assistant controller draft the April 30th letter for him, testified that he never intended to exercise the renewal option without first renegotiating the terms of the renewal contract. He further testified that the letter was meant to notify CP Summit that Prudential intended to exercise the renewal option if certain rental terms could be renegotiated. The assistant controller who drafted the April 30th letter likewise

testified that the intent of the letter was to convey that Prudential intended to exercise the renewal option, contingent upon the parties agreeing to certain new terms.

Furthermore, Prudential's internal emails, when read in context, do not reflect that Prudential intended to exercise the renewal option and accept the terms as established in the original lease contract without any conditions or qualifications. One of the emails, dated March 29, 2010, indicated that Prudential's senior vice president believed that the original lease contract would be "renegotiated and renewed." Two of the emails, dated April 29, 2010 and April 30, 2010, merely pertain to whether Prudential would agree to a five-year renewal term or to some lesser period of time. The final email cited by CP Summit, which also was dated April 30, 2010, simply indicated that Prudential's senior vice president wanted to ensure that the letter got "done" and was sent out to CP Summit on that date. Accordingly, the emails relied upon by CP Summit did not show that the April 30th letter was intended by Prudential to be an unconditional exercise of the renewal option.

In any event, the deposition testimony and internal emails were not material to determining whether the April 30th letter constituted an operative notice of acceptance of the renewal option. Georgia courts have adopted an objective theory of intent for determining whether there has been acceptance of the terms of a

11

proposed contract; we look for the intent of the parties as objectively manifested in what they have communicated *to one another* rather than their unexpressed subjective intent. See *Cox Broadcasting Corp. v. Nat. Collegiate Athletic Assn.*, 250 Ga. 391, 395 (297 SE2d 733) (1982); *Greenwald v. Kersh*, 275 Ga. App. 724, 727 (621 SE2d 465) (2005); *Moore v. Farmers Bank of Union Point*, 184 Ga. App. 86, 88 (360 SE2d 640) (1987). Hence, the deposition testimony and internal emails, which pertained to Prudential's unexpressed subjective intent behind the drafting of the April 30th letter, were immaterial under the circumstances here.

Additionally, CP Summit maintains that the April 30th letter must be construed in light of the May 13th email sent by CP Summit to Prudential that stated in part, "We are glad that you have exercised the option at Summit Point." According to CP Summit, Prudential, by failing to respond to this assertion in the May 13th email, was estopped from arguing that it had not exercised its option or that a renewal contract had not been formed by the parties. We are unpersuaded.

"Acquiescence or silence, when the circumstances require an answer, a denial, or other conduct, may amount to an admission." OCGA § 24-3-36. See *St. Mary's Hosp. of Athens v. Cohen*, 216 Ga. App. 761, 762-763 (1) (456 SE2d 79) (1995). And,

12

"[i]n the ordinary course of business, when good faith requires an answer, it is the duty of the party receiving a letter from another to answer within a reasonable time. Otherwise he is presumed to admit the propriety of the acts mentioned in the letter of his correspondent and to adopt them." OCGA § 24-4-23. See *Jerkins v. Jerkins*, 300 Ga. App. 703, 706-707 (2) (686 SE2d 324) (2009). Nevertheless, the particular circumstances of the case must be such as "to create a real or apparent duty to speak"; otherwise, mere silence will not work an estoppel. *Peach Consolidated Properties v. Carter*, 278 Ga. App. 273, 275-276 (1) (628 SE2d 680) (2006).

We conclude that the rule of estoppel by silence is not applicable in the present case. As an initial matter, the uncontroverted evidence shows that Prudential notified CP Summit by letter on July 27, 2010 of its intent to vacate the office space at the shopping center at the end of the current lease term on October 31, 2010. In light of the July 27th letter, which was sent to CP Summit several months before the original lease term expired, Prudential arguably was not merely silent in the face of the May 13th email. Nonetheless, even if Prudential never responded to the May 13th email, the email itself clearly contained an offer of new and different terms for the renewal of the lease, and it indicated that Prudential should respond if it accepted those proposed terms, after which CP Summit would draft an amended lease for Prudential

13

to review. Under these circumstances, where the email on its face contained a new counteroffer and thus reflected that the parties had not reached mutual agreement on the terms for renewing the lease, Prudential's mere silence in response to the email cannot be construed as an admission that the lease had in fact been renewed. See *Cross v. Tokio Marine & Fire Ins. Co.*, 254 Ga. App. 739, 743 (2) (563 SE2d 437) (2002).

Lastly, CP Summit maintains that the renewal option should be enforced based on the doctrine of promissory estoppel. But a necessary element of promissory estoppel is reasonable reliance. See *Tampa Bay Fin. v. Nordeen*, 272 Ga. App. 529, 532-533 (2) (612 SE2d 856) (2005). Here, CP Summit could not have reasonably relied on the April 30th letter as constituting the exercise of the renewal option contained in the lease because, as previously discussed, the letter on its face qualified and conditioned any exercise of the option on the parties agreeing to new and different rental terms.

For these combined reasons, we conclude that the uncontroverted evidence shows that Prudential did not exercise its option to renew the lease under the terms and conditions set forth in the original lease between the parties. Prudential instead made a counteroffer, and the parties ultimately were unable to reach agreement on

14

renegotiated terms. Accordingly, the trial court's order granting summary judgment to CP Summit and denying it to Prudential is reversed, and the case is remanded with direction that summary judgment be entered in favor of Prudential.

*Judgment reversed and case remanded with direction. Adams and McFadden, JJ., concur.*